UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DWAYNE MELLERSON,

                    Petitioner,                    **No.  08-CV-6050(VEB)**

          -vs-                                      **DECISION AND ORDER**

SUPERINTENDENT D. ROCK,

                    Respondent.

_____

## I.     Introduction

Proceeding *pro se*, Dwayne Mellerson ("Mellerson" or "Petitioner") filed a petition for

writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his state custody pursuant to a

judgment of conviction following a jury trial in New York State Supreme Court (Erie County) on

charges of assault in the first degree (New York Penal Law ("P.L.") § 120.10(3); assault in the

second degree (P.L. § 120.05(1)); and burglary in the first degree (P.L. § 140.30(2)). Mellerson

received and is currently serving concurrent determinate terms of 25 years, to be followed by a

mandatory five-year term of post-release supervision.

The parties have consented to disposition of this matter by a magistrate judge pursuant to

28 U.S.C. § 636(c)(1). For the reasons that follow, the petition is dismissed.

## II.    Background

The relevant trial testimony is summarized below, in the Court's discussion of

Mellerson's claim regarding the insufficiency of the evidence supporting the convictions.

## III.   Standard of Review under 28 U.S.C. § 2254(d)

When a petitioner "in custody pursuant to the judgment of a State court" seeks habeas

review of "any claim that was adjudicated on the merits in State court," a habeas writ may issue only if the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1), (2). A state court decision is "contrary to" federal law as determined by the Supreme Court if either (a) "the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law," or (b) "the state court considers facts that are materially indistinguishable from a relevant Supreme Court case and arrives at an opposite result." *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).  An "unreasonable application" of clearly established federal law occurs if (a) " 'the state court identifies the correct governing legal rules from the [Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case,' " or (b) the "state court invokes a Supreme Court case and unreasonably extends its legal principle to a new context where it should not apply, or fails to extend it where it should apply." *Williams*, 529 U.S. at 407.

## IV.    The Exhaustion Requirement

A habeas petitioner must have exhausted all state remedies before seeking federal habeas relief. See 28 U.S.C. § 2254(b)(1); *Daye v. Attorney Gen'l of N.Y.*, 696 F.2d 186, 190 (2d Cir.1982) (*en banc*), *cert. denied*, 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984). In order for a claim to be considered exhausted, it must have been presented fully and fairly in federal constitutional terms to the State courts. *See*, *e.g.*, *Duncan v. Henry*, 513 U.S. 364, 365-66, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995); *Picard v. Connor*, 404 U.S. 270, 275-76, 92 S.Ct. 509, 30

L.Ed.2d 438 (1971); *Daye*, 696 F.2d at 191.A claim is exhausted if it has been "fairly presented" to the state court. *Daye*, 696 F.2d at 191. To fairly present a federal constitutional claim, the petitioner must have set forth for the state court all the essential factual allegations and legal premises now being asserted in federal court. *Id.*

## V.     The Adequate and Independent State Ground Doctrine and Procedural Default

The Supreme Court has made clear that the "adequate and independent state ground doctrine applies on federal habeas," such that "an adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (citations and internal quotations omitted). Even where the state court also considers a petitioner's arguments on the merits, that is of no moment because "federal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim." *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990). Thus, "as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision," the adequate and independent doctrine "curtails reconsideration of the federal issue on federal habeas." *Harris*, 489 U.S. at 264 n. 10; *accord Coleman v. Thompson*, 501 U.S. 722, 735, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir.2000); *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir.1994), *cert. denied*, 514 U.S. 1054, 115 S.Ct. 1436, 131 L.Ed.2d 316 (1995).

To establish a "fundamental miscarriage of justice" requires a demonstration of "actual

innocence." *See*, *e.g.*, *Calderon v. Thompson*, 523 U.S. 538, 559, 118 S.Ct. 1489, 140 L.Ed.2d

728 (1998) (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992) (."The miscarriage of justice

exception is concerned with actual as compared to legal innocence."). The Supreme Court has

emphasized that the exception has a "narrow scope," *Sawyer*, 505 U.S. at 339.  "To be credible,"

a claim of actual innocence must be based on reliable evidence not presented at trial[,]" *Schlup v.*

*Delo*, 513 U.S. 298, 324, 115 S.Ct. 851, 865, 130 L.Ed.2d 808 (1995); *accord Calderon*, 505

U.S. at 339.

## VI.    Analysis of the Petition

### A.    Ground One: Claims Attacking the Strength of the Evidence

#### 1.    Verdict Unsupported by Legally Sufficient Evidence

The law governing habeas relief from a state conviction based on insufficiency of

evidence is well established. A petitioner "bears a very heavy burden" when challenging the legal

sufficiency of the evidence in a state criminal conviction. *Einaugler v. Supreme Court of the*

*State of N.Y.*, 109 F.3d 836, 840 (2d Cir.1997).  A habeas court will uphold a state criminal

conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any*

rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis

in original)); *see also Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir.2002) ("[W]e review the

evidence in the light most favorable to the State and the applicant is entitled to habeas corpus

relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on

the evidence adduced at trial."); Policano v. Herbert, 430 F.3d 82, 86 (2d Cir.2005) (" '[I]n a

challenge to a state criminal conviction brought under 28 U.S.C. § 2554[,] . . . the applicant is

entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no

rational trier of fact could have found proof of guilt beyond a reasonable doubt.' ") (quoting

*Jackson*, 443 U.S. at 324, 99 S.Ct. 2781).

Even when "faced with a record of historical facts that supports conflicting inferences,

[this Court] must presume-even if it does not affirmatively appear in the record-that the trier

of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."

*Wheel v. Robinson*, 34 F.3d 60, 66 (2d Cir.1994). Thus, a reviewing court may not grant relief on

a sufficiency claim unless the record is "so totally devoid of evidentiary support that a due

process issue is raised." *Bossett v. Walker*, 41 F.3d 825, 830 (2d Cir.1994).

When considering the sufficiency of the evidence of a state conviction, "[a] federal court

must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186

F.3d 91, 97 (2d Cir.1999). Here, Mellerson was charged with and convicted of assault in the first

degree (P.L. § 120.10(3)) and burglary in the first degree (P.L. § 140.30(2)). Under New York

law, a person is guilty of assault in the first degree when, "[1] under circumstances evincing a

depraved indifference to human life, [2] he recklessly engages in conduct which creates a grave

risk of death to another person, and [3] thereby causes serious physical injury to another person."

N.Y. Penal Law § 120.10(3). "Serious physical injury" means "physical injury which creates a

substantial risk of death, or which causes death or serious and protracted disfigurement,

protracted impairment of health or protracted loss or impairment of the function of any bodily

organ." N.Y. Penal Law § 10.00(10). A person is guilty of burglary in the first degree under P.L.

§ 140.30(2) "when he knowingly enters or remains unlawfully in a dwelling with the intent to

commit a crime therein, and when in effecting entry or while in the dwelling or in immediate

flight therefrom, he or another participant in the crime . . . [c]auses physical injury to any person who is not a participant in the crime . . . ." N.Y. Penal Law § 140.30(2).

At trial, the jury was presented with two versions of the events that occurred on May 13, 2000. The victim, Anne Scalfani ("Anne"), testified that she met Petitioner for the first time at 4:00 a.m. on May 13, when he came over with her friend Henry "Bo" Robins (T.104; numbers in parentheses preceded by "T." refer to pages of the trial transcript). While she was showing Petitioner to the bathroom, he grabbed her arm and attempted to force herself on her sexually. Anne rebuffed his advances (T.106-107) and pushed him away.

When she returned, she told Bo what had transpired and asked that he and Petitioner leave (T.107). Petitioner told her that he was going to get more drugs at Bo's house and asked if he could return to her house. Anne told him to leave his cell phone number and she would call him to let him know if he could come over (T.108).

When Anne called Bo later and was informed by him that Petitioner was on the way to her house,  she immediately called Petitioner and told him that it was not a good idea because her sister would be home soon (T.120). Over the next few minutes, Petitioner made multiple calls to Anne. He eventually arrived at her house and began banging on her door trying to gain entry (T.128) . When Anne opened the door to ask him to leave, Petitioner punched her in the face causing her to fall down the stairs into the basement (T.128).  Petitioner followed her down the stairs, punching her in the face and head as she faded in and out of consciousness (T.131).

At the trauma room of the hospital, still bloody, beaten, and incoherent, Anne falsely told Amherst police officer Eric Davis that she had been sexually assaulted by a man named Shelton Harland ("Harland") in his car (T.231- 232).  DNA testing performed on sperm found in Anne's

vagina revealed that it matched a person named Craig Lewis ("Lewis"), who was not involved in this matter.

Two weeks later,  during a conversation with Detective Gary Dudek at the hospital, Scalfani recanted her story about Harland, and identified Petitioner as the person who had attacked her at her house (T.267). Petitioner was never charged with any type of sexual assault in connection with the incident.

Leah Paolini ("Leah"), and the victim's sister, Laura Scalfani ("Laura"), corroborated Anne's testimony that she had called them both several times that morning when she became aware that Petitioner was on his way over to her home and while he was outside banging on her door demanding entry (T.62, 246-248).

Petitioner's version of events came in the form of his statement to police two weeks after the crime. Petitioner admitted being at Anne's home with Bo, and later returning to Anne's place after he had taken Bo home (T.455). Petitioner also admitted that there were several telephone calls between him and Anne before his arrival. However, Petitioner denied assaulting Anne, telling police that he departed when she denied him entry into her home (T.460).  Petitioner's cell phone records demonstrated no usage of his phone during the critical time of the assault.

The prosecution introduced evidence from Bo Robins that Petitioner had called him on the morning of May 13th.  When Mrs. Robins refused to awaken her husband to speak to Petitioner unless it was "a matter of life and death", Petitioner told her it was. Mrs. Robins hung up on him (T.372). Later that day when he finally spoke to Bo, Petitioner apologized to him for an "altercation" he had with Anne, admitting that he "slapped" her (T.380, 384).

Petitioner's defense at trial was that the victim was a drug addict who was assaulted by

her ex-boyfriend or her drug dealer. (T.531, 547). Defense counsel argued that the jury should

accept Petitioner's statement to the police that he complied with the victim's request to leave her

home, and that he had nothing to do with her assault. Also suggested as an alternative theory was

that the victim's recall was so damaged by alcohol and drugs that she mistakenly or wrongly

accused him of the crime and had been assaulted by Harland or Lewis. (T.531, 547, 553).

Defense counsel emphasized the lack of forensic evidence linking Petitioner to the crime scene,

and the fact that the victim gave a statement to police stating that Petitioner raped her–an

assertion contradicted by the DNA test results which showed that the sperm sample taken during

the rape-kit was a match with Carl Lewis. (T.550). To this end, counsel attacked Anne's

credibility by reminding the jury that she told the police that Petitioner raped her and still

maintained this, in spite of DNA testing that excluded Petitioner as the source of the semen

found in her vagina (T.550).

As Mellerson points out, the intoxication level of the victim and primary prosecution

witness in this case was extremely high.  "Indeed, [the victim] consumed conspicuous amounts

of cocaine, along with alcohol and heroin, on the evening in question–all of which was made

known to the trier of fact through the extensive cross-examination of defendant's skilled trial

counsel."  *People v. Mellerson*, Indictment No. 00-0961-001, 2001 WL 1729715, at *2. The trial

court found that, notwithstanding the witness' copious ingestion of drugs and alcohol, her

testimony, although inconsistent in some respects, was "not rendered incredible as a matter of

law simply because the defendant finds it to be unworthy of belief." *Id.*  Under both New York

State and Federal law, "[t]he credibility of the victim and the weight to be accorded her

testimony were matters for the jury." *Id.* (citing *People v. Gruttola*, 43 N.Y.2d 116).

As the trial court held in denying Mellerson's motion to set aside the verdict under C.P.L. § 330.30, "[t]he testimony of the victim identifying defendant as her assailant, coupled with corroborative testimony of others as to defendant's use of force against her and to absence of defendant's cell phone use during the critical time of the assault, was sufficient to justify the jury's decision to find defendant criminally responsible for the acts charged. The evidence adduced at trial provided a 'valid line of reasoning and permissible inferences which could lead a rational person to conclu[de]' that defendant was guilty beyond a reasonable doubt." *People v. Mellerson*, Indictment No. 00-0961-001, 2001 WL 1729715, at *2, 2001 N.Y. Slip Op. 40596(U) (N.Y. Sup. Nov. 21, 2001) (unreported opn.) (quotation omitted). The trial court further observed, "[t]he proof, though perhaps not 'overwhelming', was certainly sufficient to sustain the jury's verdict." *Id.* Subsequently, on direct appeal, the Appellate Division held that the "conviction of both offenses is supported by legally sufficient evidence, and the verdict on both offenses is not against the weight of the evidence[.]" *People v. Mellerson*, 15 A.D.3d at 965. These rulings did not misapply the stringent standard in *Jackson v. Virginia*, 443 U.S. at 319; nor were they "objectively unreasonable" applications of *Jackson v. Virginia* under 28 U.S.C. § 2254(d)(1).

## 2.     Verdict Against the Weight of the Evidence

Any claim by petitioner that a witness' testimony was unworthy of belief is not reviewable in habeas proceedings since credibility determinations are the province of the jury. *See Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996) (dismissing habeas claim because "assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal; stating that it must defer to the jury's assessments of both of these

issues); *see also United States v. Vasquez*, 267 F.3d 79 (2d Cir. 2001) ( "The jury chose to believe the witnesses' testimony despite any inconsistencies. We will defer to the jury's assessment of credibility." ) (citing *United States v. Payton*, 159 F.3d 49, 56 (2d Cir.1998) ("Where there is conflicting testimony at trial, we defer to the jury's resolution of the witnesses' credibility. . . ."). Petitioner's attack on the victim's credibility as a witness does not provide a basis for habeas relief.

### B.       Ground Two: Violation of the Prosecutor's Disclosure Obligations

Petitioner contends that the prosecution failed to disclose several reports and "scratch notes" authored by police who investigated the case. When Mellerson raised this contention in support of his C.P.L. § 330.30 motion to set aside the verdict, the trial court found that Mellerson had not identified the allegedly exculpatory documents he had requested in fact existed and even if they did, they would pertain only to collateral matters:

> As an example, the defendant requests that foot search reports be provided, as well as any reports about whether or not a patrol officer spotted anyone in the vicinity of the victim's residence at or about the time in question. These issues are collateral at best, and any non-disclosure of said documents–assuming that any such documents even exist–would not be deemed material.

> Once again, defendant has cast a large net of assumption in the direction of the prosecutor's file hoping to ensnare some morsel of material evidence and package it under the Brady name. This is not permissible, without the defendant demonstrating a basis for believing that the specific situs of information contains exculpatory material. Even if it existed, "impeachment evidence which concerns only collateral issues is not exculpatory, and need not be disclosed by the prosecution as *Brady* material."

*People v. Mellerson*, 2001 WL 1729715, at *4 (internal citation and quotation omitted).

Subsequently, on direct appeal, the Appellate Division rejected Mellerson's *Brady* claims follows:

With respect to defendant's contention that the People either failed to disclose or untimely disclosed *Brady* and *Rosario* material, we conclude that those alleged errors do not warrant reversal where, as here, defendant has either failed to establish the existence of such material, or failed to establish that there is a reasonable possibility that, had the material been disclosed, the result of the trial would have been different. With respect to defendant's contention that exculpatory evidence concerning another potential suspect was contained in *Rosario* material that was disclosed at trial, we conclude that reversal is not required because counsel knew about the material and was able to use it at trial.

*People v. Mellerson*, 788 N.Y.S.2d at 747 (internal citations omitted).

### 1.   The Requirements of *Brady v Maryland*, 373 U.S. 83 (1963)

In order to establish that the prosecution has violated its *Brady* obligations, it must be shown that material evidence, favorable to the defense, has been concealed by the prosecutor. "The suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment . . . ." *Id.* at 87; *see United States v Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995). To be considered "material" the withheld evidence must be such that there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *Kyles v Whitley*, 514 U.S. 419, 433-434 (1995); *United States v Bagley*, 473 U.S. 667, 674-678 (1985).

### 2.   Analysis of Whether the Non-Disclosed Items Were Favorable, Suppressed, and Material

#### a.   Detective Gary Dudek's 5/28/00 and 5/31/00 Reports

Petitioner contends that the prosecutor failed to timely turn over (1) Detective Dudek's report dated May 28, 2000, indicating that the victim had been shown a photo array and was unable to identify him; and (2) Detective Dudek's report dated May 31, 2000, of his interview with the victim.

During his cross-examination of Detective Klimczak, trial counsel marked Defendant's Exhibit G, which was identified as Detective Dudek's 5/28/00 worksheet at 1220 hours (12:20 p.m.). (T.488).  Detective Klimczak admitted that the report indicated that a photo array was shown to the victim and she was unable to identify Petitioner. (T.489). Because Petitioner had the opportunity to make of the effective use of this evidence during trial to make the jury aware that the victim was unable to identify him as her attacker, he cannot demonstrate that the evidence was "suppressed" for *Brady* purposes.[1]

### b.    Detective Dudek's Case Management Checklist

Petitioner also claims that the prosecutor failed to turn over Detective Gary Dudek's case management checklist and related notes. While the record does not specifically reflect that the checklist was turned over to defense counsel, during oral argument on petitioner's C.P.L. § 330.30 motion, counsel made reference to "police notes provided by the People" and his receipt of *Rosario* material prior to opening statements. (M.30, 34; numbers in parentheses preceded by "M." refer to pages of the C.P.L. § 330.30 motion transcript). As Respondent points out, a review of the notes does not reveal any information that was not elicited at trial. Thus, even assuming he could demonstrate the element of "suppression", he cannot show that there is a reasonable probability that the outcome of the trial would have been different had the checklist been turned over prior to trial.

---

[1]    Petitioner's argument that had trial counsel been in possession of Detective Dudek's May 28, 2000 report, he could have requested a *Wade* hearing, is without merit. The purpose of a *Wade* hearing is to challenge the suggestiveness of an identification procedure. Here, the victim did not identify Petitioner, so there was no basis for a *Wade* hearing.

### c.        Detective Bruce Bruni's Report Dated May 15, 2000

Petitioner also alleges that the prosecution failed to turn over Detective Bruni's 5/15/00

report concerning an interview with a nurse who examined the victim on her arrival at

the hospital. Petitioner claims that the nurse told Detective Bruni that her examination of the

victim revealed that no rape or strangulation had occurred during the assault.  I agree with

Respondent that even if this conversation had occurred, the report would not qualify as *Brady*

material because it was not exculpatory or material to guilt: Petitioner was not charged with rape

and no testimony was elicited that he raped the victim. Although Petitioner was charged with

first degree assault, no evidence was elicited that he strangled the victim. Thus, Petitioner has

failed to demonstrate that even if Detective Bruni's May 15, 2000 report was withheld, there is

no reasonable probability that, had the evidence been disclosed, the result of the trial would have

been different.

### C.        Ground Three: Ineffective Assistance of Trial Counsel

### 1.        Overview of the *Strickland* Standard

In order to prevail on a Sixth Amendment ineffectiveness claim, a defendant must prove

(1) that trial counsel's representation "fell below an objective standard of reasonableness"

measured under "prevailing professional norms," *Strickland v. Washington*, 466 U.S. 668, 688

(1984), and (2) that "there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different," *id.* at 694. In *Strickland*, the

Supreme Court said that "[j]udicial scrutiny of a counsel's performance must be highly

deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight,

to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct

from counsel's perspective at the time." 466 U.S. at 689. Thus, a defendant must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *accord, e.g., Bell v. Cone*, 535 U.S. at 698.

On direct appeal, the Appellate Division "reject[ed] the contention of defendant that he was denied effective assistance of counsel" because "[b]ased upon [its]  review of the evidence, the law and the circumstances of this case, viewed in totality and as of the time of representation . . . defendant received meaningful representation (*see People v. Baldi*, 54 N.Y.2d 137, 146-147, 444 N.Y.S.2d 893, 429 N.E.2d 400 [(N.Y. 1981)])." *People v. Mellerson*, 15 A.D.3d at 965, 788 N.Y.S.2d at 748.  A divided Second Circuit panel recently reiterated that court's previous holding that application of the New York state standard, *e.g., People v. Baldi*,  54 N.Y.2d at 146, is not "contrary to," 28 U.S.C. § 2254(d)(1), the principles set forth in *Strickland*, which has been deemed to be the "clearly established" Supreme Court law for evaluating claims of ineffective assistance of trial counsel. *Rosario v. Ercole*, 601 F.3d 118, 126 (2d Cir. 2010) ("We emphasize again that the New York state standard for ineffective assistance of counsel is not contrary to *Strickland*.") (citing *Eze v. Senkowski*, 321 F.3d 110, 123-24 (2d Cir. 2003); *contrasting with Henry v. Poole*, 409 F.3d 48, 70 (2d Cir. 2005) (recognizing that "in the absence of a contrary decision by this Court *en banc*, or an intervening Supreme Court decision, we are bound to follow the precedents . . . that the N[ew]Y[ork] Court of Appeals standard is not 'contrary to' *Strickland*")).

With relief under the "contrary to" clause not available to Mellerson under these circumstances, given the Second Circuit's most recent pronouncement in the *Rosario* cases, the

remaining issue, then, is whether Petitioner can obtain relief on the ground that the state court's adjudication of his claim involved an "unreasonable application" of *Strickland*.  The Second Circuit has stated that the level of "unreasonableness" that must be shown under 28 U.S.C. § 2254(d)(1) "falls somewhere between merely erroneous and unreasonable to all reasonable jurists." *Brown v. Alexander*, 543 F.3d 94, 100 (2d Cir. 2008) (quoting *Overton v. Newton*, 295 F.3d 270, 277 (2d Cir.2002)). As the Circuit further explained in *Eze v. Senkowski*, 321 F.3d at 121, an unreasonable application of Supreme Court precedent means more than that the state court incorrectly applied the precedent; it had to apply the facts in an "objectively unreasonable manner." *Id.* There must be "some increment beyond error is required," although it "need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Id.* (internal citations omitted).

### 2.     Analysis of Trial Counsel's Alleged Errors

Specifically, Mellerson contends that counsel committed the following errors: (a) elicited evidence of the uncharged crime of rape during his cross-examination of the victim; (b) failed to object to the prosecutor's conduct on summation; (c) failed to request that the exercise of challenges during voir dire and the charge conference be recorded; (d) referred to petitioner as a drug dealer during his summation; (e) withdrew his request for a *Huntley* hearing despite the existence of a "viable suppression issue"; (f) failed to object to Richard Spencer's testimony; and (g) failed to request a *Wade* hearing.

### a.     Elicitation of Testimony Regarding Uncharged Crime

During his cross-examination of the victim, trial counsel drew her attention to her statement given to the police on June 5, 2000. He elicited that she had told the police that

petitioner had raped her. (T.185). Although Petitioner now claims that counsel improperly "opened the door" to what he characterizes as prejudicial testimony, trial counsel did so for strategic reasons evident in his summation. Petitioner was not charged with rape. Additionally, the jury was privy to the stipulation by the parties that DNA testing on the rape kit collected revealed that petitioner was excluded as the source of sperm found, and that it was determined to be that of Craig Lewis. By allowing the jury to see that the victim told police that Petitioner raped her, a fact she still maintained on the day of her testimony, trial counsel was attempting to attack her credibility. Trial counsel was entirely reasonable in employing this tactic in a bid to show the jury that for the victim to maintain–in light of the DNA test results to the contrary–that Petitioner had raped her, not only diminished her credibility, but also, when viewed in conjunction with her drug and alcohol use on the night of the crime, made her accusation that Petitioner was her attacker questionable. Trial counsel was not deficient in this regard.

### b.      Failure to Object to Prosecutorial Misconduct on Summation

Petitioner also argues that defense counsel was ineffective due to his failure to object to the prosecutor's comment that Petitioner "lied in his statement to police" and to the prosecutor's "vouching" for the victim.  Although this Court believes that it would have been sounder practice for trial counsel to have objected, the Court cannot say that counsel was so far outside of professional norms in failing to lodge an objection to the prosecutor's comments concerning Petitioner's statement to police or the alleged vouching. This is because, as part of the defense strategy, trial counsel elicited from the detective who took Petitioner's statement, testimony that the detective found Petitioner's statement to be candid and believable. (T.493). On summation, trial counsel reminded the jury of this testimony, and argued that Petitioner's statement was true.

-16-

(T.537). During his summation, trial counsel characterized the victim as a "drug addict" (T.531), who associated with "unsavory characters" (T.533), and who told contradictory stories to the police (e.g., she first reported that Shelton Harland sexually assaulted her in a car) (T.547). Consequently, the trial court likely would have concluded that the challenged prosecutorial comments (i.e., that Petitioner's statement was not corroborated by statements of the prosecution witnesses and that Petitioner "minimized" his involvement and "lied" to the police) were "invited" by defense counsel's summation.

I turn next to the allegations that trial counsel failed to object when the prosecutor engaged in an improper display of emotion during his closing argument. In his C.P.L. § 330.30 motion to set aside the verdict, defense counsel alleged in his affidavit that the prosecutor had tears in his eyes and that his voice cracked on summation. (M.9). While the prosecutor asked the jury not to "hold his tears against him" (T.603), he explained during oral argument of petitioner's C.P.L. § 330.30 motion that he was "overwhelmed" and that his emotions were sincere. In response the prosecutor admitted to being overwhelmed, but noted that his emotions were "sincere," and even if improper, the defense was not prejudiced because Petitioner's guilt was overwhelming. (M.10).

The trial judge, after hearing argument on the C.P.L. § 330.30 motion, ruled that Petitioner's "assertion that the prosecutor wept during his closing argument in a dramatic fashion specifically orchestrated to play to the jurors' emotions" was an "excessive" argument, and noted that he was "was present for summations of both counsel and did not view the prosecutor's comments or demeanor in that way." *Id.*

To expect an attorney to be devoid of any emotion during summations is unreasonable. It

is, however, plainly improper for the prosecutor to attempt to secure a conviction by appealing to the jury's sympathies, passions, prejudices, or biases. If the prosecutor had been as emotional as trial counsel later contended, he should have promptly objected and requested a curative instruction. However, the fact that the trial counsel waited until after the jury verdict to make this assertion about the prosecutor's demeanor suggests that it was not as flagrant an impropriety as he made out at the C.P.L. § 330.30 hearing. Given the trial court's specific finding expressing disagreement with defense counsel's characterization of the prosecutor's demeanor, there is no reasonable probability that the outcome of the trial would have been different had trial counsel objected to that instance of alleged misconduct.

        c.       **Failure to Request that Jury Voir Dire and the Jury Charge Conference be Transcribed**

Petitioner contends that counsel was ineffective for failing to have the jury charge conference and the exercise of challenges during jury selection recorded. The record reveals that with the exception of the challenges exercised on the first day of jury selection, July 30, 2001, the remaining challenges were exercised in chambers on the record. (JS.122, 188, 265, 324; numbers in parentheses preceded by "JS." refer to pages of the jury selection transcript)). Petitioner has not explained how he was prejudiced by trial counsel's failure to request that the proceedings recorded. Similarly, although the jury charge conference which occurred in chambers was not recorded, counsel submitted a request to charge (JS.519; Court Exhibit 2), which the court noted was addressed in chambers. (T.519). It bears noting that trial counsel had no colorable objection to the jury charges given. (T.647).

        d.       **Counsel's Alleged Reference to Petitioner and Henry "Bo" Robins as "Drug Dealers"**

-18-

Petitioner asserts that trial counsel prejudiced his defense by referring to him and Bo Robins as "two drug dealers".  As Respondent points out, trial counsel clearly referred to Robins as a "convicted drug dealer" who sold drugs to the victim and her friend; he did this as part of his strategy to diminish Robins' credibility, since he provided important corroborative evidence that Mellerson had attacked Anne (T.535). In referring to Robins' testimony, counsel argued that Robins told the jury that he got a call from Leah Paolini who wanted drugs for herself and for Anne. (T.535). After Petitioner picked him up, they drove to the victim's house in petitioner's car "delivered their drugs, had a few beers" (T.536). The reference to "their drugs" was not Petitioner and Robins' drugs, but rather Anne Scalfani and Leah Paolini's drugs, which Robins was delivering.  Mellerson's claim that trial counsel labeled him as a drug dealer is belied by the record.

### e.    Erroneous Withdrawal of the Request for a Suppression Hearing

On May 22, 2000, Petitioner gave a statement to the police after being advised of, and waiving, his rights under *Miranda v Arizona*, 384 U.S. 436 (1966) (People's Exhibit 22). Mellerson admitted that he had been to the victim's home that night but denied responsibility for her assault. During a pre-trial conference on July 24, 2001, defense counsel advised the trial court that he had discussed the matter with Petitioner, and there would be "no need to run the *Huntley* hearing." (C.2; numbers in parentheses preceded by "C." refer to pages of the pre-trial conference transcript dated July 24, 2001). In response to the trial court's inquiry as to whether Mellerson understood and was withdrawing his request, Mellerson advised the court that he understood and agreed with defense counsel. (C. 2, 3).

Mellerson now claims that trial counsel erroneously withdrew his request for a *Huntley* hearing, thereby forfeiting what he describes as a "viable suppression issue." However, as Respondent points out, Mellerson has failed to disclose the factual and legal bases for this "viable suppression issue." There is no indication that Mellerson was coerced or that the *Miranda* waiver was invalid. Given the lack of any specifics, Mellerson cannot demonstrate how he was prejudiced by the withdrawal of the *Huntley* motion. Furthermore, Mellerson stated in open court that he understood the ramifications of withdrawing the motion and consented to that decision.

> **f.      Failure to Object to the Forensic Chemist's Testimony**

Petitioner contends that trial counsel should have objected to the testimony of the chemist, Richard Spencer, concerning whether sperm can live for 48 hours, or whether an intervening act of intercourse occurred. The chemist had opined that an intervening act of sexual intercourse would not affect the presence of spermatozoa already in the vagina. Trial counsel did not cross-examine the chemist on this issue, which was a reasonable strategic decision because Petitioner was not charged with rape, and the DNA evidence found in the victim excluded Petitioner as a possible source.

> **h.      Failure to Request *Wade* Hearing**

The purpose of a *Wade* hearing is to challenge the suggestiveness of an identification procedure. Here, the victim did not identify Petitioner, so there was no basis for a *Wade* hearing. Robins' identification of petitioner from the photo array was confirmatory. Thus, there is no reasonable probability that a *Wade* hearing would have been ordered in this case.

> **D.      Ground Four: Prosecutorial Misconduct**

Petitioner argues that the prosecutor committed misconduct during summation when he (1) improperly "harped" at length about the victim's claim that she had been raped; (2) argued that petitioner lied in his statement to the police; and (3) cried during summation. Petitioner raised this claim in his C.P.L. 330.30 motion to set aside the verdict which was denied. Petitioner failed to challenge the denial of his C.P.L. 330.30 motion on appeal or to raise prosecutorial misconduct as an issue on appeal. As such, Petitioner's claim is unexhausted because he has failed to complete one full round of appellate review in the New York State courts.

The claim must be deemed exhausted, but procedurally defaulted because Mellerson has no further recourse in State court. He has already used the one direct appeal to which he is entitled. Were he to raise the claim in a C.P.L. 440.10 motion for *vacatur*, the court would be required to deny it because the prosecutorial misconduct allegations are a matters clearly discernible on the record and could have been raised on direct appeal. The state procedural rules that result in the constructive exhaustion of the claim also create a procedural barrier to habeas review of the claims unless Petitioner can demonstrate both cause for the procedural default and prejudice attributable thereto, or that failure to consider the claim will result in a fundamental miscarriage of justice. *Vargas v. Keane*, 86 F.3d 1273, 1280 (2d Cir. 1996), *cert denied*, 519 U.S. 895 (1997). This he has not attempted to do, and the Court finds that on this record, he is unable to do so. Therefore, the claim is dismissed as procedurally defaulted.

**E.      Ground Five: Erroneous Admission of Opinion Testimony on Re-Direct**

**Examination of Detective Klimczak**

Petitioner contends that the trial court erred in allowing the prosecutor to elicit from Detective Klimczak opinion testimony concerning the veracity of Petitioner's statement. Citing Crane v Kentucky, 476 U.S. 683, 689 (1986), Respondent argues that Petitioner's contention is without merit and does not present a constitutional issue cognizable in a habeas corpus petition.

The prosecutor's direct examination of Detective Klimczak elicited testimony that he had interviewed Petitioner on May 22, 2000, after advising him of his constitutional rights, which Petitioner then waived. Petitioner's written statement was read into the record. (T.459-460). During his cross-examination, trial counsel asked Detective Klimczak whether he "found anything false" in Petitioner's statement and if he had concluded that Petitioner "was candid, cooperative and truthful[.]" (T.493). Detective Klimczak responded that he had spoken with other individuals and confirmed the details related to him by Petitioner and, based upon this, had concluded that Petitioner had been truthful during the interview. (T.493).

The prosecutor began his re-direct examination by focusing on trial counsel's question to Detective Klimczak concerning his opinion of Petitioner's "honesty and candidness" in his statement. (T.510). The prosecutor then asked Detective Klimczak whether, based on his investigation and interviews with the other witnesses, he thought that when Petitioner denied assaulting the victim he was "being candid and honest." (T.511). Trial counsel's objection was overruled. The trial court, although noting that "it's the jury's opinion that counts," allowed the answer "for a limited purpose." (T.511). Detective Klimczak opined that Petitioner was "only truthful to a point." (T.512).

It is well-established that a federal habeas court "is limited to deciding whether a

conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991).  "In general, rulings by the state trial court on evidentiary questions are a matter of state law and pose no constitutional issue." *Roberts v. Scully*, 875 F. Supp. 182, 189 (S.D.N.Y.1995), *aff'd mem.*, 71 F.3d 406 (2d Cir.1995).

Petitioner's argument rests only upon state law regarding the limitations on the scope of "opening the door" or cross- or redirect-examination. See, e.g., People v. Melendez, 55 N.Y.2d 445, 451-52, 449 N.Y.S.2d 946, 950, 434 N.E.2d 1324 (N.Y. 1982) (holding that the defense's cross-examination had "open[ed] the door" to some, but not all, of the hearsay testimony: it was appropriate for the detective to repeat the statements of the informant about a witness, showing that the police suspicion of him resulted from mistaken identity, but not the informant's accusation of defendant); *accord People v. Massie*, 2 N.Y.3d 179, 183 (N.Y. 2004).  Where the opposing party "opens the door" on cross-examination to matters not touched upon during the direct examination, a party has the right on redirect "to explain, clarify and fully elicit [the] question only partially examined" on cross-examination. *People v Regina*, 19 N.Y.2d 65, 78 (N.Y. 1966) ("[T]he prosecution's question on redirect examination was properly within the scope of matters gone into on cross-examination and did no more than to explain, clarify and fully elicit a question only partially examined by the defense. It was entirely proper[.]") (citing *People v. Buchanan*, 145 N.Y. 1, 23, 24, 39 N.E. 846, 853, 854 (N.Y. 1895); Richardson, EVIDENCE (9th ed.), § 531). *Melendez* itself recognized the discretion of the trial court in the conduct of cross-examination and redirect examination, 55 N.Y.2d at 451, 449 N.Y.S.2d at 950, 434 N.E.2d 1324, and applied only New York state law in defining when "opening the door" allows for redirect beyond the scope of the cross-examination, *id.* at 451-52, 449 N.Y.S.2d at

950, 434 N.E.2d 1324.

Petitioner has not demonstrated a violation of state law, let alone one of federal constitutional magnitude as a result of the trial court's permitting this line of questioning after defense counsel "opened the door." Defense counsel consciously initiated this line of questioning on cross-examination in an attempt to have the jury hear that Detective Klimczak believed that Petitioner's statement was true. This line of questioning "opened the door" to allowing the prosecutor the opportunity to clarify that while the witness did believe some of the details that had been corroborated by other witnesses, he did not believe Petitioner's claims of non-involvement in the assault.

This claim does not provide a basis for habeas relief. *Accord Green v. Behrle*, No. 05CV810, 2008 WL 4826321, at *8 (W.D.N.Y. Nov. 4, 2008) (Scott, M.J.) ("The prejudice/probative balance for allowing this questioning was within the discretion of the trial court. Petitioner opened the door to questions about aspects of his stability, including his drug use, by asking the mother in cross-examination whether he was the stable one in that household (after asking her about her own drug use). When the mother answered 'no' to the question that petitioner was more stable, the prosecution could explore what ways petitioner destabilized the household or was less stable than her, including his drug use.").

### F.      Ground Six: Racial Discrimination During Jury Selection

In order to establish a prima facie case of discrimination in the selection of jurors under Batson v Kentucky, 476 U.S. 79 (1986), a defendant must show that the exercise of peremptory challenges by the prosecution removes one or more members of a cognizable racial group from the venire and that other facts or circumstances exist sufficient to raise an inference of

discrimination. *Messiah v. Duncan*, 435 F.3d 186, 194 (2d Cir. 2006) (explaining burden-shifting *Batson* framework).

If the trial court is satisfied that the movant has made a *prima facie* showing, the non-movant must then come forward with a race-neutral explanation for striking the prospective juror. *Id.* (citing *Batson*, 476 U.S. at 97). "This race-neutral explanation need not be 'persuasive, or even plausible' for the non-movant to meet his obligation at step two of the Batson procedure and thereby advance the inquiry to the third step." *Messiah*, 435 F.3d at 195 (quoting *Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)).

During jury selection, in response to the juror questionnaire, prospective juror, " L.H.", a an African-American woman, advised the court that she had been arrested "six or seven years ago" for cashing for a friend a check that she was unaware had been stolen. (JS.291; numbers in parentheses preceded by "JS." refer to pages from the transcripts of jury selection). The prospective juror indicated that she had been released after the friend "came in and told the truth." (JS.291). The prospective juror noted that she had been "treated fairly" and "thinks she could be fair." (JS. 292). The prosecutor exercised a peremptory challenge to this prospective juror. (JS.326).

During the exercise of challenges in the selection of alternate jurors, defense counsel "challenged the prosecutor's use of a peremptory strike." (JS.331). Although the prosecutor argued that trial counsel had not made a "sufficient showing to reach step two," the trial court stated "I'm going to recognize it [i.e., the *Batson* challenge] at this point." (JS.332).

What followed was counsel's attempt to make a prima facie case of discrimination, during which he noted that: (1) "there was a minimal amount of African Americans in the panel"

and (2) that "most of the people of color were peremptorily challenged off by the district attorney, as is his right to do." (JS.332). Trial counsel concluded by asking if a "compromise" could be reached to have L.H. sit as the second alternate juror. (JS.332). Despite the prosecutor's insistence that a *prima facie* case had not been made, the trial court requested that he provide reasons for his peremptory challenge of L.H. (JS.333).

The prosecutor then noted that although L.H. stated  she had been treated fairly and could be fair, it was his practice not to choose jurors who had prior arrests, because he "cannot take their statements at face value." (JS.336-337). When offered an opportunity to "be heard," defense counsel declined and thus did not fulfill the burden imposed on the movant at the third step of the *Batson* inquiry (JS.337).

The trial court overruled the *Batson* challenge. The Appellate Division held that the claim was unpreserved due to trial counsel's failure to make a timely exception to the trial court's *Batson* ruling. The Appellate Division did not consider the claim on the merits. Respondent has failed to address this procedural bar and, instead of arguing that the claim is procedurally defaulted, has addressed the substance of the claim. Thus, Respondent has waived the affirmative defense of procedural default.  Respondent argues (1) that the trial court erred in determining that Petitioner had made out a *prima facie* case under Batson and (2) that the reason was non-discriminatory and non-pretextual.

I disagree with Respondent's position that Mellerson had not made out a *prima facie* case. Respondent overly parses Mellerson's argument by characterizing it as a claim that because there was a "minimal amount" of African-American in the jury pool, that established a *prima facie* case under *Batson*.  However, the important point that Respondent ignores is that the

prosecutor struck all of the African-American potential jurors. "An oft-used method for such a showing is the description or discernment of a 'pattern' of strikes against panelists who are members of particular protected groups." *Id.*  Here, Mellerson articulated a *prima facie* case of racial basis in the prosecutor's use of peremptory strikes: A potentially discriminatory pattern clearly arises from the prosecutor's striking all of the African-American prospective jurors. *See Jordan v. LeFevre*, 206 F.3d 196, 201 (2d Cir. 2000) ("In the case at hand, . . . , [habeas petitioner] Jordan can articulate a *prima facie* case of a racial basis for the peremptory strikes because he showed a potentially discriminatory pattern in the peremptory strike of three black panelists."); *cf. Cousin v. Bennett*, 511 F.3d 334, 338 (2d Cir.2008) ("[A] prosecutor's challenge of the only prospective juror of a particular race could give rise to a sufficiently strong inference of racial motivation to make a prima facie showing,"); *Harris*, 346 F.3d at 347 (granting habeas where trial court unreasonably found no prima facie case of discrimination when the prosecution eliminated all four African-American jurors); *Tankleff v. Senkowski*, 135 F.3d 235, 249 (2d Cir.1998) (finding a *prima facie* case where all three African-American jurors were struck).

After Mellerson made out a *prima facie* case of discrimination, the burden of going forward then shifted to the prosecution to overcome the inference of purposeful discrimination–step two of the *Batson* inquiry. "At this stage, if the prosecutor offers no explanation, the defendant has succeeded in meeting the ultimate burden of establishing an equal protection violation." *People v. Allen*, 86 N.Y.2d 101, 109 (N.Y. 1995) (citing *Batson*, 476 U.S. at 96-98). If, on the other hand, the prosecutor offers facially neutral reasons supporting the peremptory challenge of the minority prospective juror, the inference of discrimination is overcome. *Id.* (citing *Batson,* 476 U.S. at 96-98).

The explanation offered need not rise to the level required to sustain a for-cause challenge. *Batson*, 476 U.S. at 97. The Supreme Court has held that as a matter of Federal constitutional law, *Batson*'s step two requirement is fulfilled by the non-movant offering any facially neutral reason for the challenge–even if that reason is ill-founded or implausible–as long as the reason does not violate equal protection. *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995) (*per curiam*); *Hernandez*, 500 U.S. at 360, 111 S.Ct. at 1866-1867 (The second step "does not demand an explanation that is persuasive, or even plausible. 'At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral'").

Here, the prosecutor did fulfill his burden under *Batson*'s second step by articulating a facially neutral reason for peremptorily striking the prospective juror, stating that it was his practice to challenge jurors who had personal experiences with the criminal justice system. Respondent argues that there is a rational basis for the suspicion that a person accused of a crime might be sympathetic to an accused criminal and might be biased against the prosecution. Respondent points out that prosecutors have been permitted to peremptorily remove potential jurors on the ground that the potential jurors in question were related to a person or  persons who have been accused or convicted of a crime.  *See Green v. Travis*, 414 F.3d 298, 300-01 (2d Cir. 2005) (accepting as a satisfactory race-neutral reason for peremptory strike the prosecutor's explanation that the prospective jurors had relatives who had been convicted of drug offenses); *Jordan v. Lefevre*, 293 F.3d 587, 594 (2d Cir.2002) ("Nor do we see error in the district court's finding that [the prosecutor's] exercise of five of the State's peremptory challenges against blacks was not motivated by their race. [The prosecutor] offered race-neutral reasons for each of those

challenges. It was not impermissible for the district court to credit his explanations that he

viewed [one juror] as potentially having animosity toward the police because of [that juror]'s

view that the police had unfairly arrested and beaten his brother [.]"); United States v Lampkins,

47 F.3d 175 (7th Cir. 1995); *United States v. Lawal*, No. 97-1026, 129 F.3d 114 (Table), 1997

WL 664794 (2d Cir. Oct. 21, 1997) (unpublished opn.) ( "Both jurors were challenged on the

basis of family criminal histories, and one juror was also challenged on the basis of his age and

demeanor. These bases are well-accepted, facially race-neutral reasons."); *Copeland v. Walker*,

258 F. Supp.2d 105, 126 (E.D.N.Y.2003) (stating that the record demonstrated "plausible,

race-neutral reasons for the exercise of peremptory challenges" where one excused African-

American juror had a "close" cousin previously convicted of crimes); *Owens v. Portuondo*, No.

98 CIV. 6559 (AJP), 1999 WL 378343, at *10  (S.D.N.Y. June 8, 1999) ("The prosecutor

explained that he challenged [three minority jurors] because they had family members who were

incarcerated. A family member's criminal history has been found to constitute a race-neutral

factor for a peremptory challenge of a prospective juror.") (internal citation to record omitted;

citing *United States v. Lawal*, 1997 WL 664794 at *1 (challenges "on the basis of family

criminal histories . . . are well-accepted, facially race-neutral reasons"); *United States v. Wiggins*,

104 F.3d 174, 176 (8th Cir .1997) ("this court has held that 'the incarceration of a close family

member is a legitimate race-neutral reason justifying the use of a "peremptory strike" " '); *United

States v. Mathis*, 96 F.3d 1577, 1582 (11th Cir.1996) ("The record shows that [the potential

juror], who is Hispanic, was removed because a close family member of hers had had a cocaine

conviction. There was no clear error in allowing the strike . . . ."), *cert. denied*, 520 U.S. 1213,

117 S.Ct. 1699 (1997); *United States v. Casper*, 956 F.2d 416, 419 (3d Cir.1992); *United States*

*v. Johnson*, 941 F.2d 1102, 1109 n. 4 (10th Cir.1991); *United States v. Forbes*, 816 F.2d 1006, 1010 (5th Cir.1987); *Jordan v. LeFevre*, 22 F. Supp.2d at 272; *United States v. Franklyn*, No. S1 96 Cr. 1062, 1997 WL 334969, at *5-6 (S.D.N.Y.1997)*, aff'd,* 157 F.3d 90 (2d Cir.1998)).

The prosecutor's offering of a facially neutral reason for striking prospective juror L.H. moved the *Batson* inquiry to the third step, during which the movant (i.e., Petitioner) is required to satisfy the burden of persuading the trial court that the race-neutral reason or reasons proffered by the prosecution are merely a pretext for discrimination. *Purkett v Elem*, 514 U.S. at 767 (holding that "[i]f a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination"); *see also*, *e.g.*, *People v. Payne*, 88 N.Y.2d 172, 181 (N.Y. 1996). "Under *Batson*'s burden-shifting procedure, the burden of production may shift to the non-movant, but the 'ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.'" *United States v. Thomas*, 320 F.3d 315, 320 (2d Cir. 2003) (quoting *Purkett v. Elem*, 514 U.S. at 768).

Here, after the prosecutor gave his reason for striking prospective juror L.H., defense counsel was asked if he had any argument in response to the prosecutor's proffered explanation; counsel replied that he had "nothing further." In the absence of any further objection by defense counsel, the trial judge denied Mellerson's *Batson* motion and excused prospective juror L.H.

Mellerson has not demonstrated that there were circumstances undermining the validity of the prosecutor's proffered reason, such as "[t]he uneven application of a facially race neutral explanation" which courts have held, in any event, "does not, by itself, necessarily establish the invalidity of the explanation." *Owens v. Portuondo*, 1999 WL 378343, at *10 (citing, *inter alia*,

*Matthews v. Evatt*, 105 F.3d 907, 918 (4th Cir.) ("*Batson* is not violated whenever two veniremen of different races provide the same responses and one is excused and the other is not . . . because counsel must be entitled to make credibility determinations in exercising peremptory challenges."), *cert. denied*, 118 S.Ct. 102 (1997)); *see also United States v. McCoy*, 848 F.2d 743, 745 (6th Cir. 1988).  Rather, as the Second Circuit has stated, "[t]he force of a prosecutor's explanation for challenging a minority member of a venire is obviously weakened substantially by evidence that non-minority members to whom the same explanation applies were not challenged." *United States v. Alvarado*, 951 F.2d at 25; *see also United States v. Alvarado*, 923 F.2d 253, 256 (2d Cir.1991) ("The relative plausibility or implausibility of each explanation for a particular challenge assessed in light of the prosecution's acceptance of jurors with similar circumstances, may strengthen or weaken the assessment of the prosecution's explanation as to other challenges and thereby assist the fact-finder in determining overall intent."); *Roman v. Abrams*, 822 F.2d 214, 228 (2d Cir.1987) (district court properly found that prosecutor's reasons for striking minority jurors were pretextual where the prosecutor gave one explanation for striking White prospective jurors (their connection with law enforcement) but then failed to peremptorily strike some non-White prospective jurors with similar connections), *cert. denied*, 489 U.S. 1052, 109 S.Ct. 1311 (1989); *People v. Rodriguez*, 211 A.D.2d 275, 279-80, 627 N.Y.S2d 614, 617-8 (App. Div. 1st Dept. 1995) ("One of the significant factors to be considered in determining whether a race-neutral explanation is non-pretextual is whether it has been applied consistently to all prospective jurors, whether or not they are members of the protected group.").

Here, Mellerson has not demonstrated that the prosecutor engaged in an uneven

application of a facially race-neutral explanation by failing to strike a non-minority juror who shared the same traits as the struck minority juror. Notably, defense counsel did not even mention this as a potential basis for finding pretext; as noted above, he offered no argument in response to the prosecutor's proffered reason for exercising the peremptory strike.  Mellerson has failed to point to any other circumstances which would rebut the trial court's finding that the prosecutor offered a non-pretextual, race-neutral explanation for exercising the peremptory challenge as to potential juror L.H.[2]  The trial judge here complied with both the "letter . . . [and] the spirit of *Batson*," *Jordan v. Lefevre*, 206 F.3d at 201-202, permitting each party an opportunity to be heard. Given that the trial judge was in the ideal position to weigh the demeanor and believability of the prosecutor, the Court cannot find that there was error in the trial court's resolution of Mellerson's *Batson* claim. Accordingly, habeas relief on Mellerson's *Batson* must be denied.

### G.      Ground Seven: Claims Relating to Sentencing

Petitioner contends that he was improperly sentenced as a second felony offender given his challenge to the constitutionality of the prior conviction used as the predicate felony offense. He also argues that his sentence is harsh and excessive in light of his previous convictions, which involved what he describes as "fairly minor drug offenses."

### 1.      Erroneous Adjudication of Petitioner as a Second Felony Offender

On December 18, 2001, the prosecutor filed with the trial court, and served upon

---

[2]      As noted above, the Appellate Division, in disposing of Mellerson's appeal, held that "[b]ecause defendant 'failed to articulate to [Supreme Court] "any reason why he believed that the prosecutor's explanation[ was] pretextual,"' he has failed to preserve that contention for our review."  *People v. Mellerson*, 15 A.D.3d at 965, 788 N.Y.S.2d at 747 (quotations omitted; alterations in original).

Petitioner, a statement pursuant to C.P.L. § 400.21. (S1.3; numbers in parentheses preceded by "S1." refer to pages of the transcript dated December 18, 2001). At that time, Petitioner advised the court that he no longer wanted trial counsel to represent him and requested a new attorney. (S1.4).

Petitioner then told the court that the predicate felony offense (a July 8, 1994 conviction for third degree attempted criminal possession of a controlled substance listed in the C.P.L. § 400.21 Statement) was unconstitutionally obtained because "it was an illegal search and seizure of a premises." (S1.7). The trial court assigned new counsel to represent petitioner and set the matter down for a hearing on January 3, 2002. (S1.9).

On January 9, 2002, Petitioner appeared with new counsel who advised the court that he had recently spoken with Petitioner concerning the second felony offender hearing and Petitioner was now claiming that he had not been advised of the ramifications of his previous guilty plea to earlier, unrelated offense. (S2.3, 12; numbers in parentheses preceded by "S2" refer to pages of the transcript dated [ ]). Mellerson's new counsel noted that based on his review of the file and conversations with previous trial counsel, there had been no "infringement of constitutional issues that were inflicted upon the defendant during his plea colloquy." (S2.3). New counsel then requested an adjournment so that Petitioner could file a C.P.L. § 440.10 motion challenging prior trial counsel's representation. (S2.3).

After denying Petitioner's request for an adjournment to file a C.P.L. § 440.10 motion, the trial court revisited the second felony offender statement. In response to the trial court's question as to whether he was contesting the prior conviction, Petitioner responded that counsel had advised him that it was "the best route for me to take." (S2.8). Finding that a failure to have

advised Petitioner of all the possible consequences of his prior plea would not affect the validity

of his that conviction, and that Petitioner had failed to meet his burden of controverting the

allegations in the second felony offender statement, the trial court ruled that Petitioner was a

second felony offender as defined by New York's Penal Law. (S2.13, 15, 16). Mellerson has not

demonstrated that the trial court failed to correctly apply New York law. *See People v. Harris*,

61 N.Y.2d 9, 16 (N.Y. 1983) ("But this court has never held, and we refuse to so hold now, that a

predicate conviction upon a guilty plea is invalid solely because the Trial Judge failed to

specifically enumerate all the rights to which the defendant was entitled and to elicit from him or

her a list of detailed waivers before accepting the guilty plea. There is no requirement for a

'uniform mandatory catechism of pleading defendants.'") (quotation omitted).

Petitioner also claims that substitute counsel was unprepared and rendered ineffective

representation at sentencing. Petitioner requested that a new attorney be assigned to represent

him on December 18, 2001, and the trial court granted his request. At that time, the trial court

had scheduled the sentencing hearing for two weeks later on January 3, 2002. New counsel

requested a one week adjournment to allow more time in which to familiarize himself with

petitioner's file. (S2.17). Petitioner claimed that his prior guilty plea was involuntary because he

did not know he was pleading guilty to a felony; however, he has not credibly substantiated this

contention. He states that his plea was "based on an illegal search and seizure" and therefore was

involuntary; however, since Fourth Amendment rights are non-jurisdictional, a defendant's

knowing and voluntary guilty plea waives Fourth Amendment claims. *Sullivan v. Goord*, No.

05-CV-6060L, 2007 WL 2746900, at *13 (W.D.N.Y. Sept. 19, 2007) (Larimer, D.J., adopting

Report and Recommendation of Bianchini, M.J.) (citing *United States v. Arango*, 966 F.2d 64, 66

(2d Cir.1992) (holding that defendant's guilty plea waived his right to object to the constitutionality of the search of his van); *Tobon v. United States*, 132 F. Supp.2d 164, 168 (S.D.N.Y. 2001) (holding that, by virtue of his plea agreement, petitioner waived ability to collaterally challenge an alleged violation of his Fourth Amendment rights, i.e., lack of probable cause for his questioning or for the search of the vehicle in which he was stopped). Finally, Mellerson alleged that trial counsel at the plea was ineffective because he later was disbarred for drug use; standing alone, however, that fact did not establish that prior counsel rendered deficient advice in connection with the guilty plea.

At the rescheduled sentencing hearing, Mellerson's substitute counsel told the court that he researched Petitioner's allegations of ineffective assistance of counsel based on the prior representation in connection with the guilty plea used as the predicate felony, and opined that the constitutionality of the prior plea was not called into question. (S2.17).  Given Petitioner's failure to substantiate the bases for vacating the prior guilty plea, he has not demonstrated that substitute counsel's assessment of his legal claim was incorrect, much less objectively unreasonable. Therefore, Petitioner has not demonstrated that he did not received effective assistance in connection with his sentencing hearing.

Finally, Petitioner's concurrent determinate sentences of 25 years plus five years of post-release supervision are within the limit set by New York's Penal Law for a second felony offender. Mellerson's challenge to the length of his sentences thus does not present a federal constitutional question cognizable on habeas review. *E.g.*, *White v. Keane*, 969 F.2d 1381, 1382 (2d Cir. 1992).

**VI.    Conclusion**

For the reasons stated above, the Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the Petition is dismissed.  Because Petitioner has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(2).

**IT IS SO ORDERED.**

/s/ Victor E. Bianchini

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:        March 29, 2011
              Rochester, New York